# AFFIDAVIT IN SUPPORT OF APPLICATION FOR CRIMINAL COMPLAINT

I, Jonathan A. Duquette, being first duly sworn, hereby state as follows:

## INTRODUCTION AND INVESTIGATOR BACKGROUND

1. I make this affidavit in support of an application for a criminal complaint charging Gregory Kelly with transmitting an extortionate threat, in violation of 18 U.S.C. § 875(b); and transmitting a threatening interstate communication, in violation of 18 U.S.C. § 875(c).

2. I am a Task Force Officer with the Federal Bureau of Investigation (FBI). I have been in this position since June 2015, and I have been a Task Force Officer in FBI's Boston Division since January 2018. I am also a Border Patrol Agent with the U.S. Border Patrol and have been in this position since December 2009. In my career, I have utilized various investigative tools and techniques, to include the use of search warrants.

3. I am an investigative or law enforcement officer of the United States within the meaning of Section 2510(7) of Title 18, United States Code, and am empowered by law to conduct investigations of and to make arrests for federal criminal offenses.

4. This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint. The facts set forth in this affidavit are based upon my personal knowledge, information obtained during my participation in this investigation including information provided by other investigators, my review of documents and computer records related to this investigation, and information gained through my training and experience.

**PROBABLE CAUSE**

5. On November 29, 2022, I obtained a search warrant for the person of Gregory Kelly. A copy of my affidavit in support of the warrant is attached as Exhibit 1 and incorporated here.

6. Other investigators and I executed the search warrant later on November 29 at Kelly's residence in Gorham. When we arrived Kelly was outside speaking with a Gorham police officer about what I learned was an unrelated matter. FBI Supervisory Special Agent Gregory Hughes and I identified ourselves to Kelly, and told him we had a search warrant for his cell phone. Kelly reached into his pocket and said, "Here you go" as he handed a phone to me.

7. I attempted to interview Kelly but his behavior was erratic and he did not seem to comprehend the questions I asked.

8. Forensic examiner Mattheu Kelsch of the New England Regional Computer Forensics Laboratory, who has received specialized training in the forensic analysis of cell phones and other electronic devices, created an image copy of the Google Pixel 4a cell phone seized from Kelly under the search warrant. The cell phone was assigned the telephone number I identified in my search warrant affidavit as the Target Telephone.

9. I subsequently reviewed the image copy for information responsive to the warrant and found a number of items pertaining to the threats described in Exhibit 1.

10. In a Notes application, I found what appeared to be a draft or transcription of the threatening voicemail message that I described in Paragraph 12 of my search warrant affidavit. The message was left following a call to victim K.P. that occurred at

approximately 6:44 p.m. on September 25, 2022. The note's creation time was 6:50 p.m. on September 25.

11. Web history information found on the phone showed that the phone's user made numerous searches on the morning of September 25 for the telephone number of C.W., one of the individuals referenced in the threatening text messages sent to K.P. on September 25. As noted in Paragraph 11 of my search warrant affidavit, C.W. also received a threatening voicemail message on September 25. The web searches for C.W.'s telephone number preceded the call that left the threatening voicemail.

12. When K.P. received the text messages that I described in my search warrant affidavit, he was in Maine at his workplace.

**CONCLUSION**

13. Based on the foregoing, I submit that probable cause exists to believe that on September 25, 2022, Gregory Kelly knowingly and with intent to extort money from K.P. and C.W. transmitted in interstate commerce a threat to injure K.P. and C.W., in violation of 18 U.S.C. § 875(b). I further submit that probable cause also exists to believe that on September 25, 2022, Kelly knowingly and willfully transmitted in interstate commerce a communication containing a threat to injure K.P. and C.W., in violation of 18 U.S.C. § 875(c). I respectfully request that the Court issue a criminal complaint charging him with these offenses.

Dated at Portland, Maine this 19th day of January, 2023.

Jonathan A. Duquette
Task Force Officer
Federal Bureau of Investigation

Sworn to telephonically and signed electronically in accordance with the requirements of Rule 4.1 of the Federal Rules of Criminal Procedures

Date: Jan 19 2023

*Judge's signature*

City and state: Portland, Maine

Karen Frink Wolf, U.S. Magistrate Judge
*Printed name and title*

# AFFIDAVIT IN SUPPORT OF SEARCH WARRANT APPLICATION

I, Jonathan A. Duquette, being first duly sworn, hereby state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1. I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a warrant to search the person of Gregory Kelly and any personal effects in his actual possession, further described in Attachment A, for the things described in Attachment B.

2. I am an investigative or law enforcement officer of the United States within the meaning of Section 2510(7) of Title 18, United States Code, and am empowered by law to conduct investigations of and to make arrests for federal criminal offenses. I also am a "federal law enforcement officer" within the meaning of Rule 41 of the Federal Rules of Criminal Procedure.

3. I am a Task Force Officer with the Federal Bureau of Investigation (FBI). I have been in this position since June 2015, and I have been a Task Force Officer in FBI's Boston Division since January 2018. I am also a Border Patrol Agent with the U.S. Border Patrol and have been in this position since December 2009. In my career, I have utilized various investigative tools and techniques, to include the use of search warrants.

4. This affidavit is intended to show only that there is sufficient probable cause for the requested warrant. The facts set forth in this affidavit are based on my personal knowledge, information obtained during my participation in this investigation, information from others, including law enforcement officers, my review of documents and records related to this investigation, and information gained through my training and experience.

5. Based on the facts set forth in this affidavit, I submit that there is probable cause to believe, and I do believe, that violations of Title 18, United States Code, Sections 875(b) (interstate transmission of extortionate communication) and 875(c) (interstate threatening communications) have occurred. I submit that there is also probable cause to search the locations described in Attachment A for evidence of these crimes, further described in Attachment B.

**PROBABLE CAUSE**

6. Between approximately September 2020 and April 2021, Gregory Kelly was employed as a box truck driver in the materials handling department of Abbott Diagnostics ("Abbott"), located at 5 Bradley Drive, Westbrook, Maine. During his employment with Abbott, Kelly was supervised by "K.P.," who worked for site manager, "C.W."[1] While employed, Kelly communicated with K.P. using telephone number 207-572-2499 (the "Target Telephone").

7. Kelly had job performance issues, such as tardiness and absenteeism along with erratic behavior (e.g., climbing under box trucks looking for "starships") during his employment. Sometime in January 2021, Kelly was placed in Spring Harbor Hospital. Upon his return to Abbott in February 2021, Kelly's supervisors observed a noticeable improvement in his demeanor. However, within weeks, Kelly's job performance deteriorated, and he was terminated in April 2021. C.W. was unavailable on that particular day, so K.P. informed Kelly he was being terminated. Kelly was angry at the termination and filed an appeal with Human Resources. After review, Kelly's termination was affirmed.

8. Neither K.P. nor C.W. had any contacts with Kelly until September 25, 2022, approximately 17 months after Kelly's termination.

---

[1] I am using initials to describe these individuals to safeguard their privacy.

9. On September 25, 2022, at approximately 7:22 a.m., K.P. received the following text message from the Target Telephone:[2]

[2] I have redacted the names of K.P., C.W. and others from the screenshots of the text message to preserve those individuals' privacy.



The following is a transcription of the entire text message:

> Hey fuck head you still sucking that fat fucking slobs ass.. your crackhead ass is gonna get what's coming.. and you're fooling nobody with that fake ass busted geriatric wife of yours.. what you shot too much dope or sucked one too many dicks for a hit on the rock? Did she save you? You fucking pussy. You better watch your back because your fake ass is going to get it.. or how about we do it like men and have a straight up duel.. I'd beat your ass but your just an old man.. lets make it even.. either way people are coming for you.. we're gonna take your shit, your job, every red cent you have. And you can tell that fat disgusting pathetic excuse for a human being [C.W.] that his bitch ass is on the line.. we got dirt on all you dumb fucks.. video, audio, emails, messages, and the case is rock solid. And your little fuck toy [another Abbott employee] is a straight up weak bitch.. I'll fuck his ass up and force him to rat you out.. he's a bitch and better be locked and loaded at all times.. You think I don't know that you've plotted against me with [another Abbott employee].. I got that hours of audio from your office.. I know everything you, [C.W.], [another Abbott employee], [another Abbott employee], and the other pussies they work the overnight. Those fucks better watch out.. if someone fucks me over I bide my time, collect my case, gear up and take each one of you down one at a time or as many as we can.. you don't know who you fucked with Mr. [K.P.].. you fucked with the wrong one.. consider this a warning it's only fair that I give y'all at least that..you'll see me coming I don't stab people in the back.. I cut their face.. next time you see me you better get on your knees and beg for mercy... Tell [C.W.] I'll take him on mono e mono and

knock that slob the fuck out.. be a pussy and call the cops or be a man.. I'm calling you out [K.P.].. what you gonna do about it?

10. On September 25, 2022, at approximately 8:14 a.m., K.P. received the following text message from the Target Telephone:

10:38
78%
Greg Kelly work
in.. you pulled some
dirty shit firing me
before a paid vacation
that I earned.. and
bitch ass left
early.. and that pussy
overnight manager
that you had
in the office with
me when you fired
me.. You tell him
that if I ever see
his fucking face no
matter where It is.. It
could be at church,
it could be with this
kids, It could be with
his grandmother,
It could be with his
overnight fuck buddy,
It could be when he's
out shooting dope
or getting high on
some other shit that
drug addict would
suck a dick for.. I'm

10:38
78%
Greg Kelly work
some other shit that
drug addict would
suck a dick for.. I'm
gonna curb stomp
that bitch.. and my
brothers arms from
The Nationalist
Social Club are with
me everyday.. and
everyday we fight,
shoot, cut and are
ready at a moments
notice.. you see I was
a prospect but proved
myself loyal to the
cause and now I'm in
for life... Im looking
forward to getting my
laces after we deal
with all you.. don't
worry old man you
won't get the curb
stomp someone will
and I got my Docs
nice and polished
ready serve up some
Type to compose

10:38
77%
Greg Kelly work
with all you.. don't
worry old man you
won't get the curb
stomp someone will
and I got my Docs
nice and polished
ready serve up some
justice. And if your
pussy was wants to
report me go right
ahead because
everything's been set
in motion and they
can put me in jail but
it won't stop what's
going to happen.. I
earned my stripes
You couldn't have
done a fraction of the
shit that I did under
orders.. now I'm on
the council and my
word holds weight
and I got a whole
army of loyal brothers
who would fight to

10:38
77%
Greg Kelly work
You couldn't have
done a fraction of the
shit that I did under
orders.. now I'm on
the council and my
word holds weight
and I got a whole
army of loyal brothers
who would fight to
the death for me as
I would for them. I
want the money that
you and owe
me with interest..
let's make it an even
1500.. and every week
that goes by and I
don't have my money
it's going to go up
$500.. and you best
believe I am going to
get what's mine even
if I have to fight and
take what's mine.. if
you and

The following is a transcription of the text message:

> One more thing.. why you calling people faggots? I mean I guess you can say it because you obviously love it when [another Abbott employee] licks your ass but really stop being racist and homophobic.. I got a great audio clip of your stupid ass talking so much derogatory hate speech.. I can't wait for shit to go down.. you're going to end up with nothing.. and I hate to bring [another Abbott employee] into all this but she's got a big mouth and said some things that corporate will find very offensive.. sorry bitch but she's going down too.. you're time fast approaching.. there's nothing you can do about it.. I was told to keep quiet but fuck that I'm enjoying this way too much.. your so fucked.. one last thing... I want the money that I'm owed for the work I put in.. you pulled some dirty shit firing me before a paid vacation that I earned.. and [C.W.'s] bitch ass left early.. and that pussy overnight manager that you had in the office with me when you fired me.. You tell him that if I ever see his fucking face no matter where It is.. It could be at church, it could be with his kids, It could be with his grandmother, It could be with his overnight fuck buddy, It could be when he's out shooting dope or getting high on some other shit that drug addict would suck a dick for.. I'm gonna curb stomp that bitch.. and my brothers arms from The Nationalist Social Club are with me everyday.. and everyday we fight, shoot, cut and are ready at a moments notice.. you see I was a prospect but proved myself loyal to the cause and now I'm in for life... Im looking forward to getting my laces after we deal with all you.. don't worry old man you won't get the curb stomp someone will and I got my Docs nice and polished ready to serve up some justice. And if your pussy was wants to report me go right ahead because

> everything's been set in motion and they can put me in jail but it won't stop what's going to happen.. I earned my stripes You couldn't have done a fraction of the shit that I did under orders.. now I'm on the council and my word holds weight and I got a whole army of loyal brothers who would fight to the death for me as I would for them. I want the money that you and [C.W.] owe me with interest.. let's make it an even 1500.. and every week that goes by and I don't have my money it's going to go up $500.. and you best believe I am going to get what's mine even if I have to fight and take what's mine.. if you and [C.W.] want to do this the hard way then it won't be just me that you'll be dealing with I don't give a fuck either way as long as I get my money.. But if my crew has to put in work then you're going to have to pay each one of them.

11. On September 25, 2022, at approximately 9:23 a.m., C.W. received a call from a private number. C.W. did not answer the call and let the call go to voicemail. A male caller, who sounded like Kelly to C.W., left the following message:

> "You're fucked you fat fuck...better watch your back cuz I'm fucking coming for you."

12. On September 25, 2022, at approximately 6:44 p.m., K.P. received a call from a private number. K.P. did not answer the call and let the call go to voicemail. A male caller, who sounded like Kelly to K.P., left the following message:

> Hey yo [K.P.] you still sucking [C.W.'s] baby dick? Or is it too hard to find under that obese poor excuse for a human being's slob gut? And what about [another Abbott employee]? Is that sick fuck can't even have kids still licking your ass? You tell that bitch he better lose the name [another Abbott employee] – he's defective and doesn't deserve to have that name. You, [C.W.], and [another Abbott employee] are low class and you will always be low class. My bloodline will always be better than all of you because we've always been in the aristocracy. We have good genes. We kept our bloodline clean. [C.W.] is a low class English blood, was a poor excuse of a human being, and should do everyone a favor and just overdose on Twinkies. [K.P.], I'm talking to you. I got people that know you. And the [unintelligible] crew knows all about the dirty shit you did, you race traitor. You're a fucking rat. Judgment time is fast approaching and it's gonna be fun to sit back and watch the show. Good luck, motherfucker, cuz you're gonna need it.

13. On September 25, 2022, at approximately 7:34 p.m., K.P. received a call from a private number. K.P. did not answer the call. The caller did not leave a message.

14. On September 25, 2022, at approximately 11:50 p.m., C.W. received from a private number. C.W. did not answer the call. The caller did not leave a message.

15. Neither K.P. nor C.W. could think of why Kelly would mention the other Abbott employees he mentioned in his messages.

**FOLLOW-UP INVESTIGATION**

16. Publicly available information showed that the Target Telephone was assigned to Verizon Wireless.

17. On October 13, 2022, toll and subscriber records were received from Verizon Wireless on the Target Telephone. The subscriber was identified as, "Please forward to reseller: TRACFONE."

18. On October 19, 2022, subscriber records were received from TracFone, which identified the subscriber as Gregory Kelly, born XX/XX/1990, from Gorham, Maine. Records also identified the device as having serial number 358118100449824. Publicly available information identified the device as a Google Pixel 4A 5G based on the serial number.

19. Verizon Wireless toll analysis confirmed the Target Telephone sent text messages to K.P. on September 25, 2022, at 7:22:55 a.m., 8:14:36 a.m., and 8:16:28 a.m. The Target Telephone called K.P. on the same date at 6:45:08 p.m. and again on 7:34:42 p.m. During the phone calls, the user of the Target Telephone dialed *67 prior to making the call.[3] The timestamps on the toll records match or closely match (within one minute) the times provided by K.P. The messages sent at 7:22:55 a.m. and 8:14:36 a.m. were sent as Multimedia Messaging Service (MMS) messages. The message sent at 8:16:28 a.m. was sent as a Short Messaging

[3] *67 is a free process that hides a telephone number, which when typed will show up on the receiving caller ID as "Private" or "Blocked."

Service (SMS) message. I know from open-source research that text messages that exceed the "maximum size" will automatically convert to an MMS message. The maximum size depends on the device and the firmware version. The SMS message sent at 8:16:28 a.m. utilized the Westland_SF01SL switch. Additional records from Verizon Wireless provided the location for the Westland_SF01SL switch as Michigan.

20. Verizon Wireless records also show that the MMS messages sent at 7:22:55 a.m. and 8:14:36 a.m. utilized the Network Element Name MMS17. Additional information obtained from Verizon Wireless identified MMS17 as a virtual mobile messaging switching center (MMSC) which resides on the Verizon Cloud Platform in the area of Twinsburg, Ohio. Based on records available, the physical location of the Target Telephone cannot be determined at the time of the MMS and SMS messages. However, the MMS messages routed through the Virtual MMSC in Ohio and the SMS message routed through a switch located in Michigan before being received by K.P. in Maine.

21. Verizon Wireless toll analysis confirmed the Target Telephone called C.W. on September 25, 2022, at 9:24:20 a.m. and again on 11:50:34 p.m. Again, the user of the Target Telephone dialed *67 before making the call. The timestamps on the toll records match or closely match (within one minute) the times provided by C.W.

**ELECTRONIC STORAGE AND FORENSIC ANALYSIS**

22. As described above and in Attachment B, this application seeks permission to search for records that might be found in the possession of Gregory Kelly, in whatever form they are found. One form in which the records might be found is data stored on digital devices or other storage media. Thus, the warrant applied for would authorize the seizure of electronic

storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

23. Based on my knowledge, training, and experience, I respectfully submit that, if digital devices are found in Kelly's possession, there is probable cause to believe that the items described in Attachment B will be stored in the devices for at least the following reasons:

a. Individuals who engage in criminal activity store on digital devices documents and records relating to their illegal activity, which can include email correspondence and text or other MMS or SMS messages.

b. Individuals who engage in the foregoing criminal activity, in the event that they change digital devices, will often "back up" or transfer files from their old digital devices to that of their new digital devices, so as not to lose data, including that described in the foregoing paragraph, which would be valuable in facilitating their criminal activity.

c. Digital device files, or remnants of such files, can be recovered months or even many years after they have been downloaded onto the medium or device, deleted, or viewed via the internet. Electronic files downloaded to a digital device can be stored for years at little or no cost. Even when such files have been deleted, they can be recovered months or years later using readily available forensics tools. When a person "deletes" a file on a digital device such as a computer, a smart phone, or a memory card, the data contained in the file does not actually disappear; rather, that data remains on the storage medium and within the device unless and until it is overwritten by new data.

d. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the digital device that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space—for long periods

of time before they are overwritten. In addition, a digital device's operating system may also keep a record of deleted data in a "swap" or "recovery" file. Similarly, files that have been viewed via the internet are automatically downloaded into a temporary internet directory or "cache." The browser typically maintains a fixed amount of electronic storage medium space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed Internet pages. Thus, the ability to retrieve "residue" of an electronic file from a digital device depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer, smart phone, or other digital device habits.

24.  *Forensic evidence.*  As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how any device found in Gregory Kelly's possession was used, the purpose of its use, who used it, and when.  There is probable cause to believe that this forensic electronic evidence might be on any such devices because:

    a.    Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

    b.    Forensic evidence on a device can also indicate who has used or controlled the device.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

    c.    A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to

          draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

f. I know that when an individual uses an electronic device to send threatening communications, the individual's electronic device will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime. The electronic device is an instrumentality of the crime because it is used as a means of committing the criminal offense. The electronic device is also likely to be a storage medium for evidence of crime. From my training and experience, I believe that an electronic device used to commit a crime of this type may contain: data that is evidence of how the electronic device was used; data that was sent or received; and other records that indicate the nature of the offense.

25. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of any devices found in Gregory Kelly's possession consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

**CONCLUSION**

26. Based on the foregoing, I believe that there is probable cause to believe that violations of 18 U.S.C. §§ 875(b) and 875(c) have occurred, and that the evidence and instrumentalities of these offenses, more fully described in Attachment B, are located at the location described in Attachment A. I respectfully request that the Court issue search warrant for the location described in Attachment A, authorizing the seizure and search of the item described in Attachment B.

I declare that the foregoing is true and correct.

Jonathan A. Duquette
Task Force Officer
Federal Bureau of Investigation

Sworn to telephonically and signed electronically in accordance with the requirements of Rule 4.1 of the Federal Rules of Criminal Procedures

Date: Nov 29 2022

City and state: Portland, Maine

Judge's signature

Karen Frink Wolf, U.S. Magistrate Judge
Printed name and title

UNITED STATES DISTRICT COURT DISTRICT OF MAINE